U.S. DISTRICT COURT
WESTERN DISTRICT of LOUISIANA
RECEIVED - ALEXANDRIA

MAR 29 2007

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| SOUTHWEST LOUISIANA HEALTHCARE SYSTEM, ET AL | : | DOCKET NO. 05-1299 |
| VS. | : | JUDGE TRIMBLE |
| MBIA INSURANCE CORPORATION, ET AL | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Before the Court are two motions: "Cambio Health Solutions, LLC's Motion to Dismiss Plaintiffs' Conspiracy, Fraud, Punitive Damage and Duress Claims" (doc. #146) and "Argil-Tarpon's, O'Keefe's and Starkweather's Notice of Joinder in Cambio Health Solutions, LLC's Motion to Dismiss Plaintiffs' Conspiracy, Fraud, Punitive Damages and Duress Claims and Additional Motion to Dismiss" (doc. #149). Plaintiffs oppose the motions as well as the notice of joinder. For the following reasons, both motions will be granted.

## FACTUAL STATEMENT

On July 20, 2005, Plaintiffs, Southwest Louisiana HealthCare System and Southwest Louisiana Hospital Association, d/b/a Lake Charles Memorial Hospital (collectively referred to as the "Hospital") filed the instant Complaint for damages and declaratory relief. The Complaint and Amended Complaint make the following allegations:

The Hospital's operations are financed in part by over $100 million in bonds issued from 1992 through 2000. Generally, the transactions involved the issuance of tax exempt bonds by public authorities, the proceeds of which were loaned to Southwest Louisiana HealthCare System, Inc.

("SLHCS"). AMBAC and MBIA are Bond Insurers. As Bond Insurers, AMBAC and MBIA were granted certain rights to direct the bond trustee to enforce rights and remedies in the event SLHCS violated its obligations under the loan agreements, including the right to require the retention of consultants to assist Lake Charles Memorial Hospital.

The Complaint and Amended Complaint allege that AMBAC, MBIA and certain Bondholders have sought to renege on their obligations to the Hospital by contriving a default under the bonds. It further alleges that these Defendants enlisted the assistance of the Bond Insurers' accountants and consultants to provide ostensibly "independent" advice and services to the Hospital. Plaintiffs complain that Defendants prompted physicians and other employees to leave, sought to disrupt the Hospital's operations, altered audits, and opposed the use of independent accountants or consultants. The alleged purpose of Defendants' actions was to force the Hospital to sell its facilities or merge with another hospital.

On April 16, 2003, PriceWaterhouseCooper ("PwC"), announced that it would require the Hospital to substantially increase its money reserves for doubtful accounts before it would sign its audit report. Plaintiffs allege that PwC capitulated to the demands of its other clients, AMBAC and MBIA, by issuing a revised opinion report which wrongfully suggested the existence of an Event of Default in its final opinion, dated May 14, 2003. Plaintiffs then allege that they were forced, under duress and threat, to hire management consultants, attorneys and other professionals.

At the request of MBIA and AMBAC, Cambio Health Solutions, LLP ("Cambio") was hired by the Hospital as a consultant to review several areas of the Hospital's operations. Plaintiffs allege that the Bond Insurers unreasonably withheld acceptance of other consultants recommended and chosen by the Plaintiffs. Plaintiffs also allege that Cambio had a direct conflict of interest because

2

it together with its parent, Quorum Health Group, was acquired by Triad Hospitals of Dallas ("Triad") which owns Women & Children's Hospital of Lake Charles, a direct competitor of the Plaintiffs.[1]

Prior to the consulting agreement, Cambio and the Hospital entered into a Confidentiality Agreement. Between January and May 2004, Cambio engaged in its analysis of the Hospital's operations and presented its report to representatives of the Hospital including Plaintiffs' officers and board members. Plaintiffs complain that Cambio breached its Confidentiality Agreement and its duty to maintain confidentiality by using the Confidential Information for purposes "other than analyzing the financial condition of the Client," including but not limited to recommending a sale of the Hospital. Specifically, Plaintiffs allege that Cambio provided "competitors and the Bond Insurers with confidential trade secrets which could be exploited in negotiations for the sale of the Hospital; . . ."[2] Plaintiffs also complain that Cambio breached its Consulting Agreement by providing "strategic" management advice even though its President, Tom Singleton, disavowed Cambio's competence to render such advice.

Argil-Tarpon Management, LLC is a bondholder, and Randy Starkweather and Jim O'Keefe, (collectively referred to as "Argil-Tarpon") were officers, directors, managers and/or partners of Argil-Tarpon.[3] Plaintiffs allege that Cambio, Argil-Tarpon and the Bond Insurers breached their duty of good faith, failed to disclose relevant relationships between Cambio and Triad and refused

---

[1] Plaintiffs allege that AMBAC and MBIA disclosed at some point during negotiations that Cambio was previously owned by Triad, but had been spun-off.

[2] Amended and Supplement Complaint, ¶ 232.

[3] It is further alleged that Argil-Tarpon became a bondholder prior to 2004 and sold its bond interests sometime in 2004.

3

to approve any independent consultant, or any consultant other than Cambio.

Plaintffs allege that in the fall of 2003, Argil-Tarpon began communicating with the Trustee and Bond Insurers in efforts to cause a default in an attempt to force a sale of the Hospital to a for-profit hospital at a reduced cost. On July 27, 2004, during a visit to the Hospital, Jim O'Keefe, of Argil-Tarpon, expressed to the Hospital that a sale of or partnership for the Hospital would probably be required and suggested that senior management needed financial protection. He also represented to Elton Williams, CEO of the Hospital, that he should help convince the Hospital Board of the necessity to sell, and that Williams and other senior management would be protected. Hence, Plaintiffs assert a cause of action against Argil-Tarpon for commercial bribery pursuant to Louisiana Revised Statute 14:73.

Plaintiffs generally allege that all defendants (purportedly including MBIA, AMBAC, PwC, Wellspring, Argil-Tarpon, Randy Starkweather, Jim O'Keefe and Cambio) participated in conspiracy to defraud plaintiffs causing them to incur unnecessary expenses and inconvenience in an effort to cause the Hospital to default on its obligations and/or to sell or merge with some other entity.[4]

## RULE 12(B)6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint when it fails to state a claim upon which relief can be granted. In considering a Rule 12(b)(6) motion, the Court must accept the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in plaintiff's favor.[5] "In order to avoid dismissal for failure

---

[4] Complaint ¶¶ 209, 214, and 220.

[5] *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *Fernandez-Montes v. Allied Pilots Ass'n.* 987 F.2d 278, 284 (5th Cir. 1993); *Brumberger v. Sallie Mae Servicing Corp.*, 2003 WL 1733548, *1 (E.D. La. March 28, 2003).

to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations. . . ."[6] "Legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[7] "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial."[8]

## LAW AND ANALYSIS

*Fraud and conspiracy to defraud*

Plaintiffs have alleged that defendants, Cambio and Argil-Tarpon, were part of a conspiracy to engineer a sale or takeover of the Hospital. Plaintiffs argue that while such a conspiracy may not, in and of itself, necessarily be "fraudulent", the conspiracy was fraudulent in this particular case because it was carried out under false and fraudulent pretenses. Plaintiffs then make new allegations asserted in its Answer to MBIA's and AMBAC's Counter-Claim to support its allegations of a conspiracy to defraud and/or fraud.

In a pleading alleging fraud, a plaintiff must state the circumstances constituting fraud with particularity.[9] In deciding a motion to dismiss for failure to state a claim, "courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."[10] Not only are Plaintiffs requesting that this Court consider allegations not properly

---

[6] *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).

[7] *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).

[8] *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).

[9] Fed.R.Civ.P. 9(b).

[10] *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

before it, they are also asking that we consider allegations made against other defendants (MBIA and AMBAC). This Court will not consider allegations that have not been properly alleged in a complaint or amended complaint.

In our Memorandum Ruling dated August 31, 2006 (doc. #132), we addressed defendants, MBIA's and AMBAC's motion to dismiss the conspiracy to defraud claims and found "that Plaintiff has failed to allege with particularity specific facts in compliance with Federal Rule of Civil Procedure 9(b) to establish a conspiracy to defraud," and that "Plaintiffs have failed to allege particularized facts that these defendants conspired with one another to commit a fraud."[11] The Court has considered the allegations made against Cambio and Argil-Tarpon in the complaint and amended complaint, and for the same reasons stated in the August 31, 2006 Memorandum Ruling, we find that Plaintiffs have not sufficiently pled a claim for fraud and/or conspiracy to defraud against defendants, Cambio and Argil-Tarpon.

Even though the Court finds that Plaintiffs' claims for fraud and/or conspiracy to defraud are not sufficiently pled in the complaint and amended complaint without considering the allegations made in the answer to MBIA's and AMBAC's counter-claim, the court has reviewed and considered these additional allegations and concludes that they do not sufficiently plead particularized facts of how Cambio or Argil-Tarpon participated in a fraud or conspiracy to defraud Plaintiffs. For example, Plaintiffs allege that (1) *AMBAC* encouraged PwC to increase Accounts Receivables to be written off as "bad debt", (2) *MBIA*'s watchlist confirms that PwC issued an audit for FY02 with going concern issues as a result of constant pressure from *creditors*, (3) counsel for *AMBAC* and *MBIA* was advised that there was no basis for rejecting BKD as a management consultant, (4)

---

[11] Mem. Ruling dated August 31, 2006 (doc. #132), p. 8.

counsel for the *Bond Insurers* was advised not to send a proposed letter to the Trustee demanding a notice of continuing default, (5) *AMBAC* and *MBIA* falsely represented that Plaintiffs had refused to engage a management consultant, (6) the *Bond Insurers* falsely represented that Ernst & Young was not sufficiently "experienced" to increase the Hospital's Available Revenues, (7) the reason *AMBAC* and *MBIA* refused to consent to the use of Ernst & Young was because Defendants did not believe that Ernst & Young would share Plaintiffs' confidential trade secrets or other information with them, (8) the purpose of the letter being sent by *AMBAC/MBIA* was to keep pressure on the President of the Hospital, (9) Jim O'Keefe, of Argil-Tarpon probed the circumstances under which the President might agree to sell, including discussions of protection for senior management in exchange for his agreement to facilitate a strategic disposition, (10) "back channels" from Cambio provided *AMBAC* and *MBIA* with information about Cambio's presentation to the Board, (11) Argil-Tarpon had a secret, internal plan of action when it purchased Series 2000 Bonds in or around May or June of 2004 to acquire a position, and then immediately act jointly with *AMBAC* to challenge the audit and pursue all avenues to implement a complete turn-around effort with an exit strategy including a sale of assets or sale of the entire system, and (12) *MBIA* confirmed internally that Defendants' "exit strategy" was a "partnership or outright sale" adding that "Triad would want it."[12]

Federal Rule of Civil Procedure 9 requires the who, what, when, where and how bo be laid out.[13] These allegations, made against MBIA and AMBAC and being asserted in these motions against Cambio and Argil-Tarpon, do not rise to the level of fraud or a conspiracy to defraud.

---

[12] Answer to AMBAC's and MBIA's Counter-Claims.

[13] *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), *modified in part on other grounds, on reh'g, and reh'g en banc denied*, 355 F.3d 356 (5th Cir. 2003).

7

Furthermore, Plaintiffs have failed to allege particularized facts that either Cambio or Argil-Tarpon conspired with another defendant to commit a fraud or conspiracy to defraud.

*Punitive damages*

Plaintiffs are seeking fraud-based treble damages and punitive damages pursuant to Tennessee law. The Cambio Consulting Agreement provides that "[t]he law of the State of Tennessee shall govern this Agreement..."[14] The Confidentiality Agreement provides that it "shall be governed by the law of the State of Texas."[15] Plaintiffs only maintain that the law of Tennessee applies. Cambio maintains that as to punitive damages, the law of Louisiana applies.

"A federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits."[16] Louisiana Civil Code article 3546 provides the following regarding punitive damages:

Punitive damages may not be awarded by a court of this state unless authorized:

> (1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or
> (2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled.

Louisiana Civil Code article 3547 provides for exceptional cases as follows:

> The law applicable under Articles 3543-3546 shall not apply if, from the totality of the circumstances of an exceptional case, it is clearly evident under the principles of Article 3542, that the policies of another state would be more seriously impaired if its law were not applied to the particular issue. In such event, the law of the other state shall apply.

The Court has already considered and decided that all of the alleged injurious conduct and

---

[14] Exhibit A to Cambio's Motion to Dismiss.

[15] Complaint, ¶ 134-36.

[16] *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003) citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 596 (1941).

injuries occurred in Louisiana.[17] Accordingly, Plaintiffs' claim for punitive damages against Cambio and Argil-Tarpon will be dismissed.

*Duress*

Plaintiffs have alleged a claim of duress against Cambio and Argil-Tarpon arguing that Cambio would not have been hired but-for Defendants' false assertions that other consultants were not qualified. Plaintiffs further assert that Cambio would not have been hire by the Hospital in the absence of false and misleading assurances that Cambio would remain independent, and free of conflicts of interest, working solely in the interest of the Hospital. Plaintiffs also assert that Cambio would not have been hired by the Hospital in the absence of false and misleading assurances that Cambio would keep the Hospital's trade secrets and other sensitive information confidential.

Pursuant to Louisiana Civil Code article 1959, "[c]onsent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation." The redactors of article 1959 provide the following definition of duress:

> This article substitutes the term "duress" for "violence or threats," the expressions used in the source Articles. According to Black's Law Dictionary (Rev. 4th ed. 1968), duress means: "Unlawful constraint exercised upon a man whereby he is forced to do some act that he otherwise would not have done. It may be either 'duress of imprisonment,' where the person is deprived of his liberty in order to force him to compliance, or by violence, beating, or other actual injury, or duress per minas, consisting in threats of imprisonment or great physical injury or death. Duress may also include the same injuries, threats, or restraint exercised upon the man's wife, child, or parent." For the drafters of the Restatement of the Law, Second, Contracts, duress takes two forms. In one, a person physically compels conduct that appears to be a manifestation of assent by a party who has no intention of engaging in that conduct. The result of this type of duress is that the conduct is not effective to create a contract. In the other, a person makes an improper threat that induces a party who has no reasonable alternative to manifest his assent. The result of this type of duress is that the contract that is created

---

[17] See Mem. Ruling dated August 31, 2006 (doc. #132) p. 13.

is voidable by the victim. This latter type of duress is in practice the more common and more important. Restatement, Second, Contracts, § § 174 and 175 (1981). In sum, "duress" is a word of art or technical word in the English language which expresses exactly what is meant by "violence or threats" in C.C. arts. 1850-1952 (1870).

The revision comments to Louisiana Civil Code article 1959, provide that legal duress can occur when "a person makes an improper threat that induces a party who has no reasonable alternative to manifest his assent."[18]

None of the conduct that Plaintiffs complain about allege any improper threats made by Cambio or Argil-Tarpon. Accordingly, the claims for duress against these defendants will be dismissed.

*Commercial Bribery*

Defendants, Argil-Tarpon and O'Keefe seek to have any claims of criminal commercial bribery asserted against them dismissed for failure to state a claim. Louisiana Revised Statute 14:73 provides the following:

> Commercial bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any private agent, employee, or fiduciary, without the knowledge and consent of the principal or employer, with the intent to influence such agent's, employee's, or fiduciary's action in relation to the principal's or employer's affairs.

Plaintiffs allege that Jim O'Keefe, a partner of Argil-Tarpon visited the Hospital and toured its facilities. During the visit, O'Keefe expressed to the Hospital that a sale or partnership would probably be required and suggested that senior management needed financial protection. O'Keefe also expressed this to the Hospital's CEO, Elton Williams and suggested that he should help convince the Hospital Board of the necessity to sell, and that Williams and other senior management

---

[18] La. Civ. Code art. 1959, Revision comments–1984, Comment (b)(West 2006).

10

would be protected.[19] These allegations are suggestions or proposals and fail to state a claim of commercial bribery against Argil-Tarpon and O'Keefe. Accordingly, they will be dismissed.

## CONCLUSION

Based on the foregoing, the motion to dismiss Plaintiffs' conspiracy, fraud, punitive damage and duress claims filed by Cambio Health Solutions, LLC will be granted, and the notice of joinder in Cambio Health Solutions LLC's motion to dismiss Plaintiffs' conspiracy, fraud, punitive damages and duress claims and additional motion to dismiss the commercial bribery claims filed by Argil-Tarpon, O'Keefe and Starkweather will be granted.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 29th day of March, 2007.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

---

[19] Complaint, ¶ 169; Amended and Supplemental Complaint, ¶ 233.