U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - ALEXANDRIA

DEC - 8 2008

ROBERT H. SHEMWELL, CLERK
BY _____
        DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| SOUTHWEST LOUISIANA HEALTHCARE SYSTEM, ET AL | : | DOCKET NO. 05-1299 |
| VS. | : | JUDGE TRIMBLE |
| MBIA INSURANCE CORPORATION, ET AL | : | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING

Before the Court are the following motions: (1) "Drawbridge Special Opportunities Fund, L.P.'s Motion to Dismiss the Second Supplemental, Amended and Restated Complaint" (doc. #258), (2) "D.B. Zwirn Special Opportunities Fund, LP's Motion to Dismiss Plaintiffs' Second Amended and Restated Complaint" (doc. #263), (3) "Motion of Defendant Argil-Tarpon Management, LLC to Dismiss the Second Supplemental, Amended and Restated Complaint" (doc. #276), and (4) "Joint Motion of Defendants James O'Keefe and Randy Starkweather to Dismiss the Second Supplemental, Amended and Restated Complaint" (doc. #279).

## FACTUAL STATEMENT

On July 20, 2005, Plaintiffs, Southwest Louisiana HealthCare System and Southwest Louisiana Hospital Association, d/b/a Lake Charles Memorial Hospital (collectively referred to as the "Hospital") filed the instant Complaint for damages and declaratory relief. The Complaint and Amended Complaint make the following allegations:

The Hospital's operations are financed in part by over $100 million in bonds issued from 1992 through 2000. Generally, the transactions involved the issuance of tax exempt bonds by public

authorities,[1] the proceeds of which were loaned to Southwest Louisiana HealthCare System, Inc. ("SWLHCS"). J.P. Morgan is the Trustee of the Bonds.[2] AMBAC and MBIA are Bond Insurers of the 1992 and 1993 series bonds.[3] The 2000 series bonds are not insured.[4] As Bond Insurers, AMBAC and MBIA were granted certain rights to direct the Bond Trustee to enforce those rights and remedies in the event SWLHCS violated its obligations under the loan agreements, including the right to require the retention of consultants to assist Lake Charles Memorial Hospital. The complaint and amended complaint allege that AMBAC, MBIA and certain Bondholders have sought to renege on their obligations to the Hospital by contriving a default under the bonds. It further alleges that these Defendants enlisted the assistance of the Bond Insurers' accountants and consultants to provide ostensibly "independent" advice and services to the Hospital. Plaintiffs complain that Defendants prompted physicians and other employees to leave, sought to disrupt the Hospital's operations, altered audits, and opposed the use of independent accountants or consultants. The alleged purpose of Defendants' actions was to force the Hospital to sell its facilities or merge with another hospital.

On April 16, 2003, PricewaterhouseCooper ("PwC"), announced that it would require the Hospital to substantially increase its money reserves for doubtful accounts before it would sign its audit report. As a result, Plaintiffs' net income was reduced and the Hospital was in default (FYE2002) of its obligations under the Indentures– a default that required the Hospital to hire a

---

[1] Memorial Hospital Service District.

[2] Second amended complaint, ¶ 52.

[3] AMBAC insured the 1992 series bonds and MBIA insured the 1993 series bonds.

[4] Second amended complaint, ¶ 16.

2

management consultant. Plaintiffs allege that PwC capitulated to the demands of its other clients, AMBAC and MBIA, by issuing a revised opinion report which wrongfully suggested the existence of an Event of Default in its final opinion (FYE2002), dated May 14, 2003. Plaintiffs then allege that they were forced under duress and threat to hire management consultants, attorneys and other professionals.

At the request of MBIA and AMBAC, Cambio Health Solutions, LLP ("Cambio") was hired by the Hospital as a consultant to review several areas of the Hospital's operations. Plaintiffs allege that the Bond Insurers unreasonably withheld acceptance of other consultants recommended and chosen by the Plaintiffs. Plaintiffs also allege that Cambio had a direct conflict of interest because it together with its parent, Quorum Health Group, was acquired by Triad Hospitals of Dallas ("Triad") which owns Women & Children's Hospital of Lake Charles, a direct competitor of the Hospital.[5]

Prior to the consulting agreement, Cambio and the Hospital entered into a Confidentiality Agreement. Between January and May 2004, Cambio engaged in its analysis of the Hospital's operations and presented its report to representatives of the Hospital including its officers and board members. Plaintiffs complain that Cambio breached its Confidentiality Agreement and its duty to maintain confidentiality by using certain confidential information for purposes "other than analyzing the financial condition of the Client," including but not limited to its recommendation of a sale of the Hospital. Specifically, Plaintiffs allege that Cambio provided "competitors and the Bond Insurers with confidential trade secrets which could be exploited in negotiations for the sale of the

---

[5] Plaintiffs allege that AMBAC and MBIA disclosed at some point during negotiations that Cambio was previously owned by Triad, but had been spun-off.

Hospital. . ."[6] Plaintiffs also complain that Cambio breached its Consulting Agreement by providing "strategic" management advise even though its President, Tom Singleton, disavowed Cambio's competence to render such advise.

Plaintiffs allege that in the beginning of 2004, defendants, Randy Starkweather, Jim O'Keefe and others (George Adams, Tom Reardon, and Daniel B. Zwirn) created a joint venture for the purpose of investing in Lake Charles Memorial Hospital 2000 series bonds.[7] Argil-Tarpon Management, LLC ("Argil-Tarpon") was originally alleged to be a bondholder, and Randy Starkweather and Jim O'Keefe, were officers, directors, managers and/or partners of Argil-Tarpon. In their second supplemental and amended complaint, Plaintiffs name Highbridge/Zwirn Special Opportunities Fund, L.P. ("Highbridge/Zwirn")[8] and Drawbridge Special Opportunities Fund, L.P. ("Drawbridge")[9] as the bondholders of the 2000 series bonds.[10] Argil-Tarpon is identified as the entity that would manage the bonds.[11] The amended complaint further alleges that Highbridge/Zwirn

---

[6] Amended and Supplement Complaint, ¶ 232.

[7] *Id.,* ¶ 44.

[8] Highbridge/Zwirn is named in the amended complaint individually and/or in the capacity of and agent and/or principal of one or more of its joint venturers, partners, owners, agents, affiliates and/or funds of Highbridge/Zwirn Special Opportunities Fund L.P. D.B.Zwirn & Co. LP, DBZ GP LLC, Zwirn Holdings LLC, Daniel B. Zwirn, Highbridge/Zwirn Capital Management LLC and or Drawbridge Special Opportunities Fund, L.P.

[9] Drawbridge Special Opportunities Fund, L.P is named in the complaint individually and/or in the capacity of an agent and/or principal of one or more of its joint benturers, partners, agents owners, affiliates and/or funds, indlucing, but not limited to Argil, D.B. Zwirn & Co. LP, DBA GP LLC, Zwirn Holdings LLC, Daniel B. Zwirn, Highbridge/Zwirn Capital Management LLC, and/or Highbridge/Zwirn Special Opportunities Fund L.P.

[10] See ¶ 3 of the second supplemental and amended complaint.

[11] *Id.* ¶ 47.

and Drawbridge are two 'hedge' funds or 'vulture' funds created by Highbridge/Zwirn and Argil-Tarpon through a joint venture.[12]

Plaintiffs allege that in the summer of 2004 (shortly after they purchased the 2000 series bonds), Argil-Tarpon began communicating via letters to the Trustee and Bond Insurers in efforts to cause a default (FYE2003) and force a sale of the Hospital to a for-profit hospital at a reduced cost.[13] On July 27, 2004, during a visit to the Hospital, Jim O'Keefe, of Argil-Tarpon, expressed to the Hospital that a sale of or partnership for the Hospital would probably be required and suggested that senior management needed financial protection.[14] He also represented to Elton Williams, CEO of the Hospital, that he should help convince the Hospital Board of the necessity to sell, and that Williams and other senior management would be protected.[15]

On or about August 12, 2004, at a meeting between representatives of the Hospital, Cambio, Argil-Tarpon, AMBAC, MBIA and the Bond Trustee, Cambio offered an opinion that the Hospital would not survive without a merger or sale.[16] Plaintiffs allege that Cambio's representative admitted to the Hospital's counsel at that meeting that Cambio was neither hired nor qualified to make a strategic recommendation.[17] Also, at that same meeting Argil, AMBAC and MBIA are alleged to have advised the Hospital that they would engage forensic accountants to examine the

---

[12] *Id.*

[13] *Id.* ¶ 58 and 61.

[14] *Id.* ¶ 65.

[15] *Id.*

[16] *Id.* at ¶ 75.

[17] *Id.* At ¶ 76.

Hospital's accounting.[18]

Plaintiffs allege that defendants, Argil-Tarpon, Drawbridge, Highbridge/Zwirn, Starkweather and O'Keefe are liable, jointly, severally, vicariously, and/or *in solido,* (both individually, and/or as principals, agents, partners, joint-venturers, aiders and abettors, and/or co-conspirators), to Plaintiffs, under Tennessee Law, for breach of contract (*i.e.* the 2000 Series Bond Documents) and/or breach of the duty of good faith and fair dealing; intentional interference with contract or abuse of right (*i.e.* the 1992 and 1993 Series Bond Documents, and/or the Cambio-LCMH Consulting Agreement); and/or violations of Tenn. Code Ann. §47-50-109. Plaintiffs further alleged that Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn breached a general duty to refrain from encouraging discussions, plans, or rumors, true or untrue, of a merger or sale, in order to increase the value of the Series 2000 bonds.[19]

Plaintiffs allege that Defendant, Cambio, is liable under the law of Tennessee, for breach of contract, recision of contract, and/or breach of the duty of good faith and fair dealing. Alternatively, Plaintiffs allege that defendant, Cambio, is liable to Plaintiffs under the laws of New York, Texas and/or Louisiana, for breach of contract, recision of contract, abuse of right, and/or breach of the duty of good faith and fair dealing.[20]

Plaintiffs allege that defendants Argil-Tarpon, Drawbridge, Highbridge/Zwirn, Starkweather and O'Keefe acted intentionally, willfully, maliciously, egregiously, and in bad faith and are liable for punitive damages under Louisiana Civil Code Article 3546, where such damages are authorized

---

[18]  *Id.* at ¶ 77.

[19]  Second amended complaint ¶ 109.

[20]  Second amended complaint, ¶ 110.

by the law of the state where the injurious conduct occurred and the law of the state where the defendant is domiciled.[21]

Plaintiffs allege that **(i)** most, if not all, of the tortious conduct of Defendants occurred in, originated from, and/or was approved in or from the state of New York, the state of Texas, and/or the state of Tennessee – which all authorize an award of treble and/or punitive damages based on the conduct alleged herein; and, **(ii)** all Defendants are domiciled in either the state of New York or the state of Tennessee – which both authorize an award of treble and/or punitive damages.

Plaintiffs seek the following special damages:

| | |
|---|---|
| BKD | $152,913.40 |
| Pitts | $121,865.81 |
| FTI Consulting | $139,723.82 (originally demanded by Trustee, but never paid) |
| American Appraisal | $ 49,108.75 |
| Cambio Health Solutions | $252,668.44 |
| Reed Smith | $117,098.13 |
| Adams & Reese | $ 4,894.77 |
| Vinson & Elkins | $1,945,659.94 (includes other services) |
| Stockwell Sievert | $113,043.83 |
| Tiber Group | $ 4,894.77 |
| Cardinal Health | $145,040.00 |

Plaintiffs further seek damages for costs and attorneys fees expended in the present action and general compensatory damages for harassment and inconvenience of management and other employees, loss of business, loss of reputation, loss of income, and loss of business opportunities, together with recision of contract, treble damages, and punitive damages.

## PROCEDURAL HISTORY

The instant matter, originally filed on July 20, 2005, named as defendants, MBIA Insurance Corp., Connie Lee Insurance Co., Connie Lee Holdings, Inc., (collectively referred to as "MBIA")

---

[21] Second amended complaint, ¶ 111.

AMBAC Assurance Corporation, AMBAC Financial Group, Inc., (collectively referred to as "AMBAC"), Pricewaterhouse Coopers, LLP ("PwC"), Argil Tarpon Management, LLC, Randy Starkweather, Jim O'Keefe, Cambio Health solutions, LLC ("Cambio"), and Wellspring Partners Ltd ("WellSpring"). PwC was dismissed without prejudice pursuant to a Stipulation of Dismissal filed by Plaintiffs on December 8, 2005.[22] AMBAC filed a counterclaim against Plaintiffs on December 16, 2005.[23] On December 22, 2005, MBIA filed a motion for more definite statement and/or to dismiss complaint[24] which was joined by AMBAC on January 6, 2005.[25] WellSpring was dismissed with prejudice on March 23, 2006[26] pursuant to a motion filed by Plaintiffs.

On May 4, 2006, the Court ruled on AMBAC and MBIA's motion and dismissed Plaintiffs' claims of insider trading and violations of securities' law, however, the Court denied the motion to dismiss claims of fraudulent inducement and conspiracy to commit fraud, and allowed Plaintiffs to file an amended complaint to allege with particularity their claims of fraud and conspiracy to commit fraud.[27] On May 18, 2006, Plaintiffs filed their amended complaint. Shortly thereafter, MBIA and AMBAC filed their second motion to dismiss Plaintiffs' claims of fraud, conspiracy, punitive damages and duress against these defendants.[28] On August 31, 2006, the Court granted MBIA and

---

[22] Doc. #36. Plaintiffs' stated purpose for the dismissal of PwC was to cure any jurisdictional defects which may have existed at the time of filing. ¶ II.

[23] Doc. #42.

[24] Doc. #44.

[25] Doc. #49.

[26] Doc. #105.

[27] Doc. #115.

[28] Docs. #117 and 118.

AMBAC's motion and dismissed with prejudice Plaintiffs' claims of conspiracy, fraud, duress and punitive damage claims under Texas, Tennessee and New York law.[29]

On February 2, 2007, Cambio, Argil-Tarpon, Starkweather and O'Keefe, by joinder, filed a motion to dismiss Plaintiffs' claims of conspiracy, fraud, commercial bribery, punitive damages and duress.[30]

On March 28, 2007, pursuant to a joint motion for voluntary dismissal, MBIA and AMBAC were dismissed from the suit with prejudice.[31] On March 29, 2007 this Court granted defendants, Cambio, Argil-Tarpon, Starkweather and O'Keefe's motion and dismissed Plaintiffs' claims of conspiracy, fraud, punitive damages, commercial bribery and duress.[32] On April 17, 2007 Plaintiffs filed a Motion for Leave to File a Second Supplemental Amended and Restated Complaint.[33] The effect of granting the motion would have been to resurrect recently dismissed claims of Plaintiffs against defendants, Cambio, Argil-Tarpon, Starkweather and O'Keefe – resulting in the Judgment of March 29, 2007 having to be vacated and/or amended. Pursuant to a request for oral argument, the Court held a hearing on the motion for leave on June 13, 2007. After hearing the arguments of the parties, Plaintiffs were ordered to file a motion to reconsider, vacate or set aside the Memorandum Ruling and Judgment of March 29, 2007.

The motion to reconsider was denied, however, after more briefing, the Court granted in part

---

[29] Docs. #132 and 133.

[30] Docs. #146, 149 and 157.

[31] Doc. #160.

[32] Doc. #161.

[33] Doc. #163.

and denied in part Plaintiffs' leave to file the second supplemental and amended complaint. The motion was denied to the extent that any claims that were dismissed with prejudice in the Court's March 29, 2007 Judgment could not be resurrected in the second supplemental and amended complaint.[34] Another motion for reconsideration was filed which was subsequently denied. Plaintiffs and defendants, O'Keefe and Starkweather, filed appeals with the Fifth Circuit. Plaintiffs were then ordered by this Court to file their second supplemental and amended complaint.[35] Plaintiff filed the second supplemental and amended complaint on December 15, 2007. In response, motions to strike allegations in the second supplemental and amended complaint were filed by Argil-Tarpon, O'Keefe and Starkweather,[36] and also Cambio.[37] The suit was then stayed pending the outcome of the cross-appeals.[38] On March 13, 2008, the appeal of O'Keefe and Starkweather was dismissed pursuant to the motion of the appellee-cross-appellants[39] and on July 3, 2008, the appeal of the Hospital was dismissed for lack of jurisdiction.[40]

## RULE 12(B)(6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint when it fails to state a claim upon which relief can be granted. The test for determining the sufficiency of a

---

[34] Doc. #208 dated October 11, 2007.

[35] Doc. # 222 dated November 27, 2007.

[36] Doc. #234.

[37] Doc. #235.

[38] Doc. #239.

[39] Doc. #246.

[40] Doc. #248.

complaint under Rule 12(b)(6) is that " 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' "[41] Subsumed within the rigorous standard of the *Conley* test is the requirement that the plaintiff's complaint be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged.[42] The plaintiff's complaint is to be construed in a light most favorable to plaintiff, and the allegations contained therein are to be taken as true.[43] In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.[44] "In order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations. . . ."[45] "Legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[46] "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial."[47]

---

[41] *Hitt v. City of Pasadena,* 561 F.2d 606,608 (5th Cir. 1977)(per curium) citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, (1957)).

[42] *Elliot v. Foufas,* 867 F.2d 877, 880 (5th Cir. 1989).

[43] *Oppenheimer v. Prudential Securities, Inc.* 94 F.3d 189, 194 (5th Cir. 1996).

[44] *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1137 (5th Cir. 1992).

[45] *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).

[46] *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir. 1995).

[47] *Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir. 1995).

## LAW AND ANALYSIS

*Breach of contract by Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn*

Defendants, Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn maintain that the complaint fails to allege a breach by these defendants of the Series 2000 bond documents. Defendants argue that because Plaintiffs have failed to allege or specify in the complaint the particular bond document provision(s) that they allegedly breached, the breach of contract claim must be dismissed. Defendants further assert that even though Plaintiffs assert in their Complaint that Tennessee law governs the bond documents,[48] the May 1, 2000 Trust Indenture provides otherwise expressly stating that "[t]his Indenture shall be governed, in all respects including validity, interpretation and effect by, and shall be enforceable in accordance with the law of the United States of America and of the State."[49] The May 1, 2000 Loan Agreement defines "State" as the State of Louisiana.[50] Plaintiffs do not oppose, respond or explain in their opposition how the bond documents could be governed by Tennessee law when the bond documents expressly provide that Louisiana law governs. Thus, we conclude that the law of the state of Louisiana governs the bond documents.

To state a claim for breach of an insurance contract under Louisiana law, a plaintiff must allege a breach of a specific policy provision.[51] Plaintiffs argue that Defendants knew that there was no basis for a default under the Loan Agreements in FYE2002 and FYE2003. Thus, Defendants

---

[48] Second Supplemental, Amended and Restated Complaint, ¶ 109.

[49] Drawbridge exhibit C, Trust Indenture, p. 35, § 10.9.

[50] Drawbridge exhibit B, Loan Agreement, p. 16.

[51] *Bergeron v. Pan Am. Assurance Co.*, 731 So.2d 1037, 1045 (La.App. 4th Cir. 1999).

breached the bond documents by their actions and demands when they had no contractual basis to

do so. Plaintiffs refer the Court to the allegations in the second amended complaint, ¶¶ 19, 23, 24,

31, 34, 35, 48, 55, 58, 61, 69, 74, 77, 78, 80, 85, 92, 101-104, 105-107. The Court notes that the

amended complaint fails to allege that the FYE2002 audit report was in error. Furthermore, it was

the  bond insurers, AMBAC and MBIA, which required the Hospital to hire Cambio as a

management consultant because of the FYE2002 default. The amended complaint further alleges

that Argil-Tarpon made several demands or requests of the Trustee to put the Hospital in default

FYE2003 due to questionable inter-company receivables.[52]    However, the second amended

complaint further alleges that the Trustee rejected Argil-Tarpon's demands and refused to issue the

default FYE2003.[53]

Plaintiffs allege that at the August 12, 2004 meeting, Argil-Tarpon and the bond insurers

advised the Hospital that it would engage a Forensic Accountant to review the Hospital's books[54]

and on November 22, 2004, the Trustee advised the Hospital that the bond insurers and certain

bondholders had instructed the Trustee to engage FTI Consulting Inc. as a forensic accountant to

"review and analyze information in relation to the financial condition, the financial reporting and

compliance with bond agreements of the User and the Restricted Group."

Defendants maintain that Plaintiffs have failed to identify a specific contract provision in any

of the bond documents that these Defendants allegedly breached. The Court agrees. The amended

complaint fails to allege any specific provision in the bond documents which the Defendants may

---

[52] Second amended complaint, ¶¶ 55, 61, 69 and 78.

[53] *Id.* ¶ 80.

[54] *Id.,* ¶ 77.

have breached. Accordingly, the claim for breach of contract against defendants, Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn will be dismissed.

*Solidary liability of Drawbridge and/or Highbridge/Zwirn with the Argil defendants (Argil-Tarpon, Starkweather and O'Keefe)*

Plaintiffs allege that Drawbridge and/or Highbridge/Zwirn are solidarily liable with the Argil defendants because they (Drawbridge, Highbridge/Zwirn, Argil-Tarpon, Randy Starkweather and Jim O'Keefe) either conspired to harm the Hospital, and/or their relationship was either a joint venture or a principal-agency relationship. Plaintiffs further maintain that Drawbridge and Highbridge/Zwirn, as partners to a joint venture are liable for the torts committed in furtherance of the partnership. Finally, Plaintiffs allege that Drawbridge and Highbridge/Zwirn, (the principals) can be held liable for the actions taken by their agent, Argil-Tarpon.

Plaintiffs allege that Drawbridge and Highbridge/Zwirn (two bondholders) are the two investment companies or "funds" who owned the bonds and Argil-Tarpon is the management company who managed the bonds.[55] Plaintiffs maintain that they have alleged a conspiracy with direct evidence of a formal agreement between the Argil defendants (Argil-Tarpon, Randy Starkweather and Jim O'Keefe) through the deposition testimony of Jim O'Keefe (an officer of Argil-Tarpon and allegedly of D.B. Zwirn & Co., L.P.) and a memo generated by Argil-Tarpon.[56] Mr. O'Keefe identified an agreement between the joint venturers (the bondholders and Argil-Tarpon) which authorized Argil-Tarpon to act as the joint venture's representative.[57] Plaintiffs

---

[55] *Id.*

[56] Second amended complaint, ¶ ¶ 44-47.

[57] Plaintiffs' exhibit B, Jim O'Keefe depo.pp. 112-116.

further allege that Mr. O'Keefe's deposition testimony established that the aim and/or motive for the joint venture between Argil-Tarpon, Drawbridge and Highbridge/Zwirn was to force a change by replacing management, and then within twelve to eighteen months, effect a sale of the assets, a sale of the entire system, or a merger with another hospital or system.[58] Plaintiffs' basis for the principal-agency liability is that the parties (Argil-Tarpon and the two funds) agreed that Argil-Tarpon would act as Drawbridge and Highbridge/Zwirn's representative with the proviso that Argil-Tarpon would keep the bondholders fully informed as to any discussions and seek their consent before pursuing any action related to the Series 2000 bonds.

Plaintiffs maintain that the Drawbridge and Highbridge/Zwirn entities enabled the joint venture, including the Argil defendants, to make bad faith demands and take other actions as the purported "owners" of the bonds. Thus, Plaintiffs argue that both Drawbridge and Highbridge/Zwirn can be held liable for the acts of its agent or partner pursuant to Louisiana Civil Code article 2324(A)[59], the law of agency (mandatary) and of partnerships. Construing the factual allegations in a light most favorable to Plaintiffs, and accepting them as true, the Court concludes that Plaintiffs have alleged sufficient facts to establish that the defendants, Highbridge/Zwirn and Drawbridge, as owners of the Series 2000 bonds, could be answerable *in solido* with the defendant, Argil-Tarpon, as either partners of a joint venture, or as a principal in a principal-agency relationship.

*Breach of the duty of good faith and fair dealing and/or abuse of right doctrine*

Plaintiffs claim that defendants, Argil-Tarpon, Randy Starkweather, O'Keefe, Drawbridge

---

[58] Second amended complaint, ¶ 45.

[59] "He who conspired with another person to commit an intentional act is answerable, *in solido,* with that person, for the damages caused by that act."

and Highbridge/Zwirn breached their duty of good faith and fair dealing and/or violated the abuse

of right doctrine by spreading rumors about the financial position of the Hospital, even though from

1992 through the present, the Hospital never missed a bond payment. Plaintiffs complain that the

rumors caused the Hospital damages because doctors and/or staff terminated their positions with the

Hospital and found employment elsewhere. Also, Plaintiffs complain that the Defendants contrived

a default (FYE2002) which caused the Hospital unnecessary and exorbitant accounting, management

consultant and legal fees causing further monetary damage. Even though Plaintiffs allege that

Defendants "contrived" a default, Plaintiffs admit that the amount of accounts receivables that are

collectible can vary under Generally Accepted Accounting Principles depending on the view of the

particular auditor or accountant in question.[60] There is no allegation that the "contrived default" was

in error; the Hospital disagreed with PwC's adjustment for bad or uncollectible accounts receivable.

The default (FYE2002) was considered a "technical default" and could be cured by the Hospital

hiring a management consultant approved by the bondholders and bond insurers.

Plaintiffs allege that the bond insurers opposed the use of independent accountants or

consultants and instead insisted on PwC and Cambio. Plaintiffs allege that PwC was not an

independent auditor because it had served as one of the bond insurers' accountants from 1998

through 2002. Plaintiffs allege that the bond insurers refused to approve their choice of a

management consultant, either Ernst & Young or BKD,[61] and instead insisted that the Hospital hire

Cambio. Plaintiffs allege they were concerned about hiring Cambio because of a prior relationship

---

[60] Second amended complaint, ¶ 24.

[61] The complaint states that the bond insurers agreed to allow the Hospital to use BKD if Plaintiffs would accept a liquidity covenant and other obligations beyond the existing requirements provided in the Bond Documents. Second amended complaint, ¶ 37.

which had existed between Cambio and Triad, who owned and operated the Hospital's primary competitor hospital in Lake Charles.[62] Plaintiffs further allege that Cambio provided Argil-Tarpon with information in breach of a Confidentiality Agreement between the Hospital and Cambio for bad faith purposes.

Plaintiffs assert that the Hospital as a non-profit organization did not have a duty to Defendants to maximize profits. Plaintiffs identify the following notice in the Bond Documents to support their position that Defendants (Argil-Tarpon and the Bondholders) breached the duty of good faith and/or abused a right under the bond documents:

> [T]he obligations described herein of the System and the Corporation to make payments on the Bonds and the Debt issued pursuant to the Loan Agreement may not be enforceable to the extent (1) enforceability may be limited by applicable bankruptcy, moratorium, reorganization or similar laws affecting the enforcement of creditors' rights and by general equitable principles.[63]

Defendants maintain that Plaintiffs' claims for breach of the duty of good faith and fair dealing must be dismissed because Plaintiffs have failed to allege that they suffered from an actual breach of the Series 2000 bond documents. Defendants also assert that Plaintiffs were not forced to sell the Hospital or enter into a merger with another party, and they received the exact consideration they were entitled to under the Series 2000 bond documents.

Under Louisiana law, the covenant of good faith and fair dealing is implied in every

---

[62] Second amended complaint, ¶ 33.

[63] Plaintiffs' exhibit A, paragraph entitled "**Matters Relating to Enforceability of the Loan Agreement**" p. 27.

contract.[64] The implied duty of good faith arises in the context of performance of a contract.[65] However, the implied obligation to execute a contract in good faith usually modifies the express term of the contract and should not be used to override or contradict them.[66] A creditor will not be liable for abuse of right merely because it exercised contractual rights in order to protect and benefit from its investment.[67]

Defendants argue that the express terms of the bond documents allowed the Bondholders to seek to declare that the Hospital was in default which triggered their rights to certain remedies. Defendants point out that the Hospital admits that its accountants, PwC, advised it that the Lake Charles Memorial Hospital would be required to substantially increase its reserves for what PwC considered to be doubtful accounts receivables before PwC would sign the final audit report FYE2002, dated May 14, 2003.[68] The Loan Agreement between the Hospital and the Bond Issuer, required that the Hospital's total Available Revenues in each fiscal year would "be not less than 120% of the Maximum Annual Debt Service Requirement."[69] The Loan Agreement further provided that if the "Available Revenues in any fiscal year shall be less than the 120% of the Maximum Annual Debt Service Requirement, the User (the Hospital) *shall* within 135 days engage a

---

[64] La. Civ. Code art. 1983.; *Grisaffi v. Dillard Dep't Stores, Inc.,* 43 F.3d 982, 983 (5th Cir. 1995).

[65] *Adams v. Autozoners, Inc.,* 1999 WL 744039, *7 (E.D.La.1999).

[66] *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir. 1984).

[67] *Lambert v. Maryland Cas. Ins.,* 403 So.2d 739, 757 (La. App. 4th Cir. 1981), *aff'd* 418 So.2d 553 (La.1982).

[68] Second Amended Complaint ¶ 23.

[69] Exhibit B, Loan Agreement § 7.9.

Management Consultant acceptable to the Trustee."[70]

Plaintiffs allege in their complaint(s) that the Hospital disagreed with PwC's opinion of "bad" or uncollectible accounts receivable, and they further believed that failure to deliver audited financial statements would result in an incurable default, under which all amounts due under the Loan Agreements could be accelerated.[71] However, there are no allegations in the amended complaint that PwC's final audit FYE2002 was in error, only that PwC capitulated to the demands of the bond insurers.

FYE2003, even though Argil-Tarpon made repeated demands for a default, the Trustee rejected Argil-Tarpon's demands. There are no allegations that the Hospital was put in default for this year.

Defendants argue that the bond documents granted them, along with any other Bondholder, an express right to protect its investment. A default of the Loan Agreement constituted a default under the Indenture.[72] The Indenture provides that "[n]otwithstanding any other provision hereof, the Applicable Percentage of Bondholders shall have the right to take any and all actions to enforce the provisions of this Indenture, the Assignment, the Security Agreement and the Mortgage in their own name."[73] Hence, Defendants maintain that it was entitled to invoke the default remedies based on the default event (FYE2002), and because the Hospital's good faith and fair dealing claim would contradict the express terms of the bond documents, the claim cannot as a matter of law survive.

---

[70] *Id.*

[71] Second Amended Complaint, ¶ 24.

[72] Drawbridge exhibit C, Indenture, § 7.1.

[73] *Id.* § 7.8.

The Court finds that the provision relied upon by Plaintiffs does not eradicate or modify the Bondholders' absolute right to protect its investment by requiring the Hospital to engage a management consultant or take advantage of other remedies available to protect their investment.[74] A conclusion by this Court that the Bondholders breached a duty of good faith and fair dealing, or abused a right expressly granted in the bond documents, would in effect contradict the bond documents' express remedies.[75]

*Tortious interference of a contract and Tennessee § 47-50-109*

Defendants, Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn, assert that the Hospital's tortious interference claim fails because Plaintiffs have failed to allege the necessary elements which, in Louisiana, are as follows:

> (1) the existence of a contract or a legally protected interest between the plaintiffs and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of

---

[74] Investment in distressed bonds with the explicit objective of thereafter invoking rights in order to facilitate a financial turnaround is a commonplace investment activity, deeply engrained in the financial marketplace. See, *e.g. Bad News Is Good News; 'Distressed for Control Investing'*, Knowledge @ Wharton, Ginance and Investment, Apr. 26, 2006, http://knowledge.wharton.upenn.edu/article.cfm.?articleid=1455 (Explaining that distressed investors act to promote changes in management and adoption of superior business strategy in order to increase the value of their investment; Stuart C. Gilson, *Investing in Distressed Situation: A Market Survey*, FINANCIAL ANALYSTS JOURNAL, Nov.-Dec.1995, at 11 (observing that distressed investors act affirmatively to seek a positive return on their investment, undertaking a proactive role in management and seeking to promote more efficient use of assets); *Rich Pickings*, FUND STRATEGY, Apr. 3, 2006 at 20 (commenting that where an entity appears in danger of defaulting on bond payments, distressed debt investors frequently act to facilitate a turnaround through a restructuring of the business).

[75] See also *Bonanza Int'l v. Rest. Mgmt Consultants, Inc.*, 625 F.Supp 1431, 1447 (E.d. La.1986)(It is well-estalibhsed under Louisiana law that the "implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those set out in the contract).

damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.[76]

Plaintiffs' response is that this Court has already ruled that the complaint sufficiently alleges this claim. This is not correct. The Court granted Plaintiff's motion for leave to file an amended complaint to make factual allegations to support this claim. While the Court recognized that Plaintiffs were attempting to allege certain claims, such as the claim for tortious interference of a contract, we never ruled substantively whether or not the facts alleged in the amended complaint were sufficient to withstand a motion to dismiss pursuant to Rule 12(b)(6).

Plaintiffs allege that Defendants, Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn interfered with either the 1992 and 1992 Series Bond Documents and/or the Cambio-LCMH Consulting Agreement.[77] The Court finds that the facts alleged are insufficient to state a claim for tortious interference with the 1992 and 1993 Bond documents.

Plaintiffs allege that these Defendants are liable under either Tennessee or New York law for the tortious interference of the contract (the Consulting Agreement) between the Hospital and Cambio. Plaintiffs maintain that they have set forth ample grounds for the application of Tennessee law referring to the second amended complaint, ¶ ¶ 3(a)-(d), 5, 6, 108, 38,41, 42, 43, 44, 45, 47, 48, 49, 51, 52, 53, 54, 55, 57, 58, 59, 61, 64, 67, 69, 70, 71, 73, 74, 78, 80, 81, 82, and 91.

Under New York and Tennessee law, to state a claim for interference of a contract, plaintiffs must allege (1) the existence of a valid contract between plaintiff and a third party, (2) defendant had sufficient knowledge of the contract, (3) defendant intentionally procured the third party's

---

[76] *9 to 5 Fashions, Inc. v. Spurney,* 538 So.2d 228, 234 (La.1989).

[77] Second Amended Complaint, ¶ 109.

breach of the contract without justification, (4) actual breach of the contract, and (5) resulting damages.[78] Tennessee Code Annotated § 47-50-109 is a statutory codification of a claim for interference with a contract at common law. The statutory cause of action permits an award of treble damages upon a "clear showing" that defendant intentionally induced the breach.[79] Thus, the complaint must allege that the Defendants had sufficient knowledge of the contract between Cambio and the Hospital, and that these Defendants procured Cambio to breach the contract without justification which resulted in a breach by Cambio and caused damages to the Hospital.

Plaintiffs allege that the Consulting Agreement between Cambio and the Hospital, dated January 22, 2004, provides that it is governed by Tennessee law.[80] The Agreement expressly provides the following:

> Cambio hereby agrees that the material provided to it by SLHCS [the Hospital] and any third party pursuant to this engagement will be used solely for the purposes stated herein, and that Cambio, its employees and agents will keep such information confidential except as otherwise required by applicable court or administrative order, law or regulation.

Plaintiffs allege that directors/officers of Argil-Tarpon were in constant contact with employee(s) of Cambio regarding financial information about the Hospital. The allegations are sufficient for the Court to infer that Argil-Tarpon was fully aware of the Cambio Consulting Agreement. Plaintiffs further allege that Argil-Tarpon repeatedly, albeit unsuccessfully, attempted to direct the Trustee to put the Hospital in default for FY2003. Furthermore, there were numerous

---

[78] *See Lama Holding Co. v. Smith Barney Ins,* 668 N.E.2d 1370 (N.Y. 1996): *TSC Indus. v. Tomlin,* 743 S.W.2d 169. 173 (Tenn.Ct.App. 1987).

[79] *Polk & Sullivan, Inc. v. United Cities Gas Co.,* 783 S.W.2d 538, 543 (Tenn.1989).

[80] Second amended complaint, ¶ 41.

communications between the defendant, Bond Insurers, Argil-Tarpon and Cambio concerning their efforts to paint a dismal financial picture of the Hospital which resulted in the recommendation of Cambio that the Hospital could not survive without a merger or a sale. Plaintiffs allege that Mr. Singleton of Cambio admitted that not only had it not been engaged to make a strategic recommendation, but that Cambio was not qualified to make strategic recommendations.

Plaintiffs allege that Argil-Tarpon (specifically, Randy Starkweather) and the Bond Insurers (AMBAC and MBIA) sent a letter, dated September 24, 2004, to the Hospital which informed the Hospital of its alleged troubled financial condition. Plaintiffs further allege that at the time the letter was written, the financial condition of the Hospital had greatly improved, the coverage ratios were met, the unsecured loans of the Hospital had been paid off, the Hospital was current with all of its suppliers and vendors, the Hospital had more than a $10 Million turnaround in cash equivalents as of August 31, 2004 and had 38 days of cash on hand. During a Medical Staff meeting, the September 24, 2004 letter was read to the Staff of the Hospital which resulted in the Staff appointing an *ad hoc* committee, a No Confidence Vote being obtained, and one of the doctors moving his practice from the Hospital. On November 22, 2004, the Trustee advised the Hospital that the Bond Insurers and Bondholders had directed him/her to engage FTI Consulting, a forensic accounting/consulting firm to review and analyze information in relation to the financial condition and the financial reporting and compliance with the Loan Agreement of the User (Hospital) and the Restricted Group.

The Court concludes that the factual allegations are sufficient to allege a claim against Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn for intentional interference of the Cambio Consulting Agreement under Tennessee law.

*Fraud or conspiracy claim*

Defendants remind the Court of its earlier dismissal of fraud and or conspiracy to commit fraud as to certain defendants (the Bondholder who at the time was alleged by Plaintiffs to be Argil-Tarpon, the Bond Insurers, Cambio and PwC). In our prior rulings, the Court only considered a conspiracy to commit a fraud. However, after further review of the second amended complaint, the Court concludes that there are sufficient factual allegations against the defendants, Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn to support a conspiracy claim among these defendants as to a tortious interference of a contract claim.

*Breach of a general duty*

The amended complaint alleges that defendants, Argil-Tarpon, Starkweather, O'Keefe, Drawbridge and Highbridge/Zwirn breached "a general duty" to refrain from "encouraging discussions, plans or rumors" about a possible merger or sale. Defendants maintain that Plaintiffs have failed to allege what general duty Plaintiffs are referring to or what legal claim they are alleging. The Court agrees. The Complaint must sufficiently inform a defendant of the claims made against him in order for a defendant to properly assert a defense. Plaintiffs have not responded as to what and/or how the Defendants may have breached a "general duty." Furthermore, neither the amended complaint nor Plaintiffs' memoranda of law alleges either how or what legal basis by which Argil-Tarpon, Starkweather, O'Keefe, Drawbridge or Highbridge/Zwirn breached a general duty under the bond documents. Accordingly, the claim for breach of a general duty will be dismissed.

*Punitive damages*

Based on our previous determination that Plaintiffs have sufficiently alleged a claim for tortious interference of a contract under Tennessee law, the Court concludes that it would be

premature to dismiss the claim.

## **CONCLUSION**

Based on the foregoing, the motions to dismiss will be granted in part and denied in part. The motions will be granted to the extent that the claims for breach of contract, breach of a general duty, breach of the duty of good faith and fair dealing, and abuse of right against Drawbridge, D.B. Zwirn & Co. LP, (Highbridge/Zwirn), Argil-Tarpon, Starkweather and O'Keefe will be dismissed; otherwise the motions are denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this $8^{\underline{th}}$ day of December, 2008.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE